Filed 3/10/15  P. v. Dorsey CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SHERMAN DORSEY,<br><br>    Defendant and Appellant. | B252126<br><br>(Los Angeles County<br>Super. Ct. No. GA083947) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stan Blumenfeld, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Sherman Dorsey (Dorsey) was charged with the murder of Gina Reano (Gina) (count 1: Pen. Code, § 187, subd. (a))[1] and the attempted murder of Grace Reano (Grace) (count 2: §§ 664 & 187, subd. (a)). As to both charges, it was alleged that he personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)). With respect to the attempted murder, it was alleged that the offense was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), and that Dorsey personally inflicted great bodily injury upon Grace (§12022.7, subd. (a)).

A jury found Dorsey guilty of the second degree murder of Gina and the attempted voluntary manslaughter of Grace. It found true that he personally used a deadly and dangerous weapon in both crimes, and that he inflicted great bodily injury upon Grace. The trial court sentenced Dorsey to state prison for 21 and a half years to life, calculated as follows: for the second degree murder of Gina, he was sentenced to 15 years to life, plus one year for the use of a deadly and dangerous weapon; for the attempted voluntary manslaughter of Grace, he was sentenced to the low term of 18 months, plus three years for the great bodily injury finding and one year for the use of a deadly and dangerous weapon. The sentence were consecutive.

Dorsey appeals from the judgment, contending that the trial court erred when it excluded expert testimony that would have explained why he stayed in a dysfunctional relationship with Gina; lightened the prosecution's burden by modifying the CALCRIM instructions regarding adequate provocation; gave incomplete instructions on the lesser included offenses; and improperly admitted rebuttal evidence regarding statements made by Gina. In addition, Dorsey claims he received ineffective assistance of counsel. Last, he urges us to reverse due to cumulative error.

We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

FACTS

**The Prosecution's Case-in-chief**

*Background*

Gina and Grace were sisters. Gina was 45 years old when she was killed on August 3, 2011, and Grace was a few years younger. Around August 2011, Gina was 4 feet, 10 inches tall and weighed about 90 pounds, while Grace was 5 feet, 1 inch tall and weighed about 100 pounds. Dorsey, in contrast, was over six feet tall and weighed between 200 and 230 pounds.

Since 1982, Gina and Grace lived together off and on in a home in San Gabriel owned by their parents.

During her adult life, Gina suffered from bipolar disorder. At times her disorder would manifest in uncontrollable screaming, throwing things, and physically attacking people. She was married several times, and her disorder led to the breakup of her first marriage.

Starting in 2004 or 2005, Dorsey worked with Grace at E! Entertainment. They were good friends. Gina got a job there in 2006. In 2010, Dorsey began dating Gina, and Grace told him about Gina's disorder. At that time, he was living in an apartment in Palms. Eventually, Gina moved into Dorsey's apartment. But then, after Gina was laid off from E! Entertainment in February 2011, they moved into the San Gabriel home with Grace so, per Gina, that they could save money to buy a house together. According to Grace, Dorsey and Gina fought verbally "quite a bit."

Dorsey and Gina married in March 2011. A few months later, in June 2011, Gina's father asked them to move out of the San Gabriel home. They did. He rented an apartment on Bagley near Culver City.

On July 30, 2011, Gina moved back to the San Gabriel home, saying she had an argument with Dorsey because he would not acknowledge her on Facebook. Grace and Gina went to dinner, and Gina said she was sad that her relationship with Dorsey did not work. She said he had a "dark side." Later that night, Grace drove Gina to Dorsey's

apartment because she was going to move and wanted to help him clean. The next day, Gina returned to San Gabriel and seemed normal.

*The Crimes*

On Tuesday, August 2, 2011, Gina asked Grace to go to Dorsey's Bagley apartment to pick up a check for her. Grace texted Dorsey to inform him that she was going to his apartment. He replied back, "Come over."

At about 11:00 p.m., Grace arrived at the Bagley apartment, but Dorsey was not home. Via a text from Gina, Grace learned that Dorsey was at the San Gabriel home. She drove back to San Gabriel and got home about midnight. Inside, she heard Dorsey and Gina talking in her upstairs bedroom. She repeatedly pleaded with him to leave. There were two bottles of wine in the kitchen sink, an empty wine bottle in the refrigerator, and beer cans in the garbage can in the kitchen.[2]

Because she was angry that Dorsey was not at the Bagley apartment, Grace called for Gina to come downstairs. After 20 minutes, Gina came downstairs and said, "We'll just talk later." Grace went to her downstairs bedroom. Later, she came out of her bedroom to talk to Gina as she cooked. Dorsey walked halfway down the stairs, saw Grace, and walked back up. Grace returned to her bedroom, put in earplugs and went to sleep.

About 5:00 a.m., Grace heard Gina screaming and ran upstairs to Gina's bedroom. She was sitting on the foot of the bed, crying, and there was blood on her face.

Dorsey was standing in between the bed and bathroom door. Grace asked, "What the fuck is going on?" In response, Dorsey lunged at Grace, grabbed her by the neck and punched her in the face and on the head multiple times. He said, "Do you want to see crazy? I'm crazy." Gina screamed, "Not my sister. Not my sister."

Dorsey dragged Grace to the bed and hit her face and head again. He took a wine glass off the end table, and broke the glass against the headboard so only the stem and bottom part of the glass were intact. Holding her down, he brought the glass down

---

[2]    At trial, Grace identified a photograph of an empty wine bottle in the garbage can in Gina's bathroom.

toward her eye.  She grabbed the glass, and it cut her hand.  They struggled over the broken glass, and he pushed it against her neck.  She managed to get the glass away from him.  Right after that, Dorsey took the lamp off the end table and smashed the lamp on Grace's forehead.

He dragged Grace to the ground and slammed the back of her head against the nightstand multiple times.  All the while, Gina was screaming, crying, and hitting Dorsey.  He turned his attention to Gina, who was on the bed, and choked her with both hands.  Grace hit Dorsey in the stomach with one or more pieces of glass.  For a while, he continued to strangle Gina on the bed, but then he got on top of Grace and choked her on the floor.  She said, "Jesus save us."  She kicked, turned and twisted until she got away and was able to scoot out of the room in a sitting position. By that time, Dorsey was at the top of the stairs trying to keep Gina from leaving.

Dorsey kicked Grace in the back, and she scooted down the stairs.  She ran out of the family home and went to a neighbor's house where she called 911.  In the call, which was played for the jury, Grace said, "My sister's husband has gone crazy!  He tried to kill me with a broken glass and I think he's killing my sister. . . ."  According to Grace, she left the front door to her house open so the police could enter.  She said Dorsey stabbed her in the hand, hit her face, strangled her, and slammed her head against a table.  In addition, she said she might have a broken thumb, and she was bleeding.  When asked if Dorsey was on drugs, Grace said, "I don't know, he's probably on alcohol."  The 911 operated asked if Grace thought Dorsey was drunk, and said, "I think so; no one can act like that if they aren't drunk."

Sheriff's deputies responded to the scene.  They saw Dorsey standing in the driveway, covered in blood. He appeared to have some sort of chest injury.  One of the deputies asked if Dorsey was injured.  Dorsey said, "I did it, man.  I stabbed her."  Asked again whether he was injured, Dorsey said he had stabbed himself.  Another sheriff's deputy went inside the house and found Gina unclothed and face down on the living room floor.  Blood was everywhere.  Emergency medical technicians rolled Gina over and tried to resuscitate her.  She was nonresponsive.

*Grace's Injuries*

During Dorsey's attack, Grace suffered an injury to her scalp, abrasions to her neck area, scratches to her left collar bone, an abrasion to her upper back, bruising to the bicep area on her right arm, a scratch to her bicep area, a bruise to the tricep area of her left arm, cuts to her right hand (to the inside of her middle finger; to the webbing between her index finger and thumb), and an injury to the palm of her hand. She also suffered a torn tendon in her thumb, which required surgical repair, and lacerations to her forehead, which required stitches.

*The Crime Scene Investigation*

Just before 8:00 a.m. on August 3, 2011, Los Angeles County Sheriff's Detective Philip Guzman and another detective responded to the crime scene. In his 30-year career, the crime scene was the bloodiest Detective Guzman had ever investigated.

The master bedroom was disheveled. Detective Guzman saw blood, overturned furniture, two broken lamps, two broken wine bottles, a broken wine glass, disturbed bedding, clothes on the floor, and broken glass everywhere, including in the bed. There was a broken wine glass against the wall, and it had what looked like long strands of human hair on it.

Gina was found on the floor of the combination family/dining room, which was separated from the kitchen by a counter. There was a bloodstained knife by her right arm, and another knife against a wall. Her face was bloody, and it bore facial injuries that were consistent with having been in a fight. She had been stabbed 13 times, with three or four stab wounds to her upper back or base of her neck, two stab wounds to the upper portion of her right chest or shoulder, and stab wounds to the left side of her chest and neck. On her right forearm/wrist, she had an injury.

Detective Guzman collected the four bloodstained knives in the kitchen area. Subsequently, he was informed that someone found a clean knife in the master bedroom under the bed or mattress.

6

*The Autopsy*

Dr. Yulai Wang, a medical examiner for the Los Angeles County Coroner's Department, conducted an autopsy on Gina.

Gina suffered a total of 13 stab wounds, five to her chest. Two stab wounds to her right upper chest area were fatal because they went between her ribs and pierced internal organs. Stab wounds to the back of her head and neck area caused significant bleeding. She had a stab wound to the left arm above the bicep, which could have been a defensive wound, and there were cuts on her left middle finger. There was an injury to her left index finger that could have been caused by broken glass. Stab wounds on her right palm between the fourth and fifth fingers were consistent with defensive wounds. She had a laceration on her wrist.

Beyond the stab wounds, Gina suffered blunt force trauma, including to her head and face. She had a combination contusion/laceration to her forehead area. In addition, she suffered a contusion to the front part of her brain. She also had abrasions on her upper left arm, which were consistent with scratches, and bruises on the back of her left hand, which were consistent with offensive wounds. Further, she had multiple contusions to the right upper arm, and there was bruising to the inner right arm consistent with being held by that arm. She had a bruise to the right buttock. Gina had abrasions on her neck that were consistent with manual strangulation.

A toxicology report established that Gina had alcohol and methamphetamine in her blood.

**Defense Evidence**

*Dorsey's Testimony*

Dorsey had bipolar family members, including his younger sister, his older sister, his grandmother, and his aunt. When he was growing up, he tried to take care of everybody. As a result, he had experience with people with mental illnesses, including bipolar disorder. Dorsey knew that if Gina took her medicine, "it could . . . sustain her."

On May 29, 2011, Gina and Dorsey attended a concert. As they were trying to exit after the concert, Gina began screaming, asking why he touched the buttocks of the

7

woman in front of them. When they got to Gina's car, she hit Dorsey, and he asked her to get in the car. Once in the car, she hit Dorsey and spit on him. As she drove, she continued to hit him.

At one point in June 2011, Gina stayed in bed for three days straight. Following that extended stay in bed, she became volatile. Sometimes, when Dorsey was asleep, Gina would kick him in the back, and Dorsey would get up and sleep in the living room or other bedroom. If Gina followed him to another room or threw things, Dorsey would sleep in his Ford Explorer. On multiple occasions, Gina scratched Dorsey's face.

Notwithstanding Gina's violence and various outbursts, Dorsey chose to stay in the relationship because he wanted to help her.

On Wednesday, July 27, 2011, Gina screamed at Dorsey when he got home from work, and threw things at him, including a vase. He left and stayed the night in his truck. He did not get any sleep.

The next day, they exchanged a series of text messages. She would not let him into the apartment. To get back into his apartment, he went through a window. She threatened to call the police and say he hit her. Dorsey dressed for work, and Gina said she would see him there and get him fired.

Dorsey went to work and alerted his boss, Kenneth Falcon (Falcon), that Gina might cause a problem. She parked outside the E! Entertainment offices in her car and honked, but she did not get out. Then, at 4:00 p.m., she texted Dorsey and said, "I'm in the building. Try stopping me from going to [Falcon's] office." Eventually, Gina drove away. At some point, Dorsey sent Gina an e-mail saying their relationship was over.

The following day, at about 7:00 p.m., Dorsey went to the apartment, Gina accused him of spending the night at a woman's house and started cutting up the sofas. Dorsey left about 15 minutes later.

On Saturday, July 30, 2011, at 1:00 a.m., Dorsey went back to the apartment, believing Gina would be gone. She was still there. She had written "cheater, cheater, cheater" on the walls. They spent the whole night talking. The next day, he helped her move back into the San Gabriel house. In the evening, they returned to the apartment to

clean and stayed until Sunday morning. Dorsey had not slept more than an hour or two in three days.

Dorsey drove Gina from Los Angeles to San Gabriel in his car and arrived around 9:00 a.m. They unpacked Gina's things, and Dorsey drove back to Los Angeles. That night, Gina called and said she was expecting an unemployment check in the mail. Dorsey said he would send it to her. But when he could not find the mailbox key, he was unable to look in the mailbox. Nonetheless, he said that he would "get her check [to] her[.]"

On the morning of Tuesday, August 2, 2011, Gina arranged with Dorsey for Grace to pick up the check at the Bagley apartment after work, maybe after 8:30 to 9:00 p.m. He told Gina he did not have the key. She felt he was trying to keep her check, and threatened to get him in trouble.

At 3:32 p.m., he texted Grace and asked what time she was coming for the check. She asked if 9:00 p.m. was okay. He texted back, "Cool." At that time, he had been drinking. He left work at 5:00 p.m. and went to the Bagley apartment. A locksmith opened the mailbox, and Dorsey retrieved the check. He started drinking vodka.

He wanted to take the check to Gina and show her the locksmith receipt, so he drove to San Gabriel, arriving a little after 9:00 p.m. He was a "little edgy" because of the "whole implication that [he] was trying to withhold her mail." It was unnerving to him that Gina said she was going to report him to the police for beating her. He gave Gina the check and showed her the locksmith receipt. Gina was happy to get her check and seemed fine. They both went upstairs and talked.

Gina told Dorsey to leave. He stayed because he wanted to end things civilly. Eventually, she offered him something to eat. Also, she offered him a beer, which he drank. They both drank wine. Sometime later that evening, Grace arrived at the house. Gina went downstairs to cook hamburgers. When she came upstairs after cooking, she used a knife to cut her hamburger.

After 1:00 a.m., they got into an argument about Dorsey's Facebook account. He went into another bedroom and deactivated the account. Gina "started getting very, like,

aggressive." She pointed at him and "hit [him] a few times." He walked to the master bedroom. Gina threw something at him, possibly a glass, and approached him. Once the situation escalated, he "got mad." He punched her in the head. Then he pushed her down, and they got into an altercation.

Grace came upstairs. She said, "What the fuck is going on?" Then she approached Dorsey, which startled him. He reacted by grabbing her. He "may have" grabbed Grace by the throat. When Grace and Dorsey were struggling and he was holding on her down on the bed, Gina was hitting him. Grace had "one of [his] testicles with the glass and was trying to cut [him]." At some point—he was not sure when—he hit Grace in the head with a lamp to get her off of him. To get Gina off of him, he may have used a wine glass. He did not "know what was going on in [his] head." He was "feeling weird," his "mind started getting cloudy," and his "mind was just racing."

Dorsey testified that he could have kicked Grace down the stairs, but did not remember if he did because his mind was "cluttered." He further did not remember how he and Gina ended up downstairs. He remembered "bits and pieces of being on the first floor."

He heard Gina "fumbling for something." It was dark. She grabbed some knives, and they scattered. Gina approached him with a knife, and he took it away. Then he stabbed her because "she was about to get a knife" and they "got into a tussle." He did not remember how many times he stabbed her. All he remembered was that he stabbed her at least once, "maybe in her arm or something." They were battling. His "mind was racing," and he did not feel like himself. He testified, "[M]y mind was just . . . going crazy." When he stabbed her, he was trying to defend himself.

Dorsey denied that he had been physically abusive with Gina on any previous occasion. In the past, when he hit Gina once or twice, he was just trying to push her off of him.

*Dr. Hy Malinek's Testimony*

Dr. Hy Malinek, a clinical and forensic psychologist, opined that at the time of the crime, Dorsey was intoxicated and depressed. A toxicology report he reviewed indicated

10

that Dorsey was on an antianxiety medication called benzodiazepine. Dr. Malinek doubted that an intoxicated person under the influence of benzodiazepine would be able to adequately process a violent situation. Further, in Dr. Malinek's opinion, Dorsey did not fit the criteria for antisocial personality or psychopathy because he did not have any history of psychopathic behaviors.

**Rebuttal**

*Jerry Ho*

In 1999, Jerry Ho (Ho) married Gina. After they separated in 2004, they lost contact. Then, in 2011, they reconnected and decided to pursue a divorce.

At some point, Gina told Ho she was afraid of Dorsey.

During the last weekend in July 2011, Gina asked Ho to help her move from the Bagley apartment to San Gabriel. Ho was unavailable. On Saturday, July 30, 2011, at 4:23 a.m., Gina texted Ho and said, "Should anything happen to me, I'm at [] Bagley Avenue, apartment 1, Los Angeles, 90034." Ho spoke to Gina by telephone and asked if he should call the police. She said that Dorsey took her car and purse, and beat her up. Also, she told Ho not to call the police or Dorsey would kill her. Nonetheless, she said everything was okay because she had her purse and wallet.

On Monday, August 1, 2011, Ho met Gina at a restaurant to sign the final divorce documents. He noticed that she had bruises on her wrist, arms and right hamstring. Also, she had a bruise on her face. Because she was wearing thick makeup, he could not discern whether she had a black eyes. She said the injuries had been caused by Dorsey. He told her to call the local sheriff, and the Los Angeles Battered Women's Organization.

*Ralph De La Torre*

On Tuesday, August 2, 2011, Gina telephoned her friend, Ralph De La Torre. She said that she had not been to work for two or three days because her husband had beaten her and given her a black eye.

11

## DISCUSSION

## I. Exclusion of Expert Testimony.

Dorsey argues that he was denied his constitutional right to present a defense because the trial court excluded Dr. Malinek's hypothesis as to why Dorsey stayed in a dysfunctional relationship with Gina.

We disagree.

A. *Relevant Proceedings*.

The defense proposed to call Dr. Malinek to testify that Dorsey stayed in a relationship with Gina because she was mentally ill and he wanted to help her as he had helped mentally ill family members. According to defense counsel, this evidence would combat any suggestion by the prosecutor that Dorsey went to Gina's house on the day of the murder with the intent to kill her.

Prior to trial, the trial court excluded this expert testimony without prejudice to it being offered if the People's evidence suggested that Dorsey intended to kill Gina when he went to her house.

When Dorsey took the stand in his own defense, he was asked: "Why is it that, notwithstanding all the craziness, notwithstanding all the outbursts and violence that Gina directed towards you, why did you choose to stay with her?" Dorsey testified, "I just wanted to help her." As a follow up, defense counsel asked if Dorsey had helped somebody else in the past, and Dorsey answered, "I had family members."

The trial court later held an Evidence Code section 402 hearing. Asked by the trial court to state his hypothesis regarding why Dorsey chose to stay with Gina, Dr. Malinek stated: "I think he felt that he has a need to heal her . . . because he himself grew up around mentally ill and schizophrenic women. This was an opportunity to work through some of his own earlier problems in his childhood and allow him to have a sense of control or to try to have a sense of control where he did not have any of this earlier on." This hypothesis was based on his "knowledge of the dynamics of dysfunctional relationships and about frequent patterns that we see in intrafamilial violence, and about complimentary needs in dysfunctional relationships, why people who are not good for

12

each other stay together. [¶] There is a body of knowledge that you could find in developmental psychology or in relationship textbooks about dysfunctional relationships that illuminate this. [¶] Just like we know that many people who have been victims of sexual molestation themselves become molesters trying to work out a piece of that later on in their lives. The same kind of thing happens in . . . this kind of situation where someone who has been a victim or abused or neglected tries to be a healer later on in their relationships, even if it doesn't work out." He further explained that his hypothesis was based on his "knowledge and study of human behavior and dysfunctional relationship and intrafamilial violence."

On cross-examination, Dr. Malinek testified that in the past his practice involved psychotherapy and couples therapy. He slowly moved into forensic work. At the time he was testifying, he was no longer working with couples. He had worked as an expert for the district attorney's office in cases involving intrafamilial violence. In connection with that work, he had opined that when a domestic violence victim does not leave the abuser, it is because of their past, such as being a child who was exposed to domestic violence in his or her family.

According to Dr. Malinek, Dorsey and Gina were "inescapably trapped in a cycle of violence[.]" Dr. Malinek formed this opinion based on the frequent arguments between Dorsey and Gina, their separation, Dorsey's complaints to coworkers about Gina's jealousy, Gina calling Dorsey's office, Gina accusing him of being unfaithful without any basis, Gina's history of mental illness and bipolarity that led to a hospital stay, and Dorsey's statements indicating that Gina and he were two people who could not live either together or apart.

The trial court asked Dr. Malinek if he had worked on cases involving "similar circumstances where people have had disorders of a similar nature that led to a similar outcome that is causing you to create this hypothesis?" He replied: "It is a hypothesis, your honor. It's not a—well, there is no specific publication or research about it. It is a hypothesis that I am developing from my clinical experience, from cases that I have seen, you know, actually with my work for the court, from literature on the dynamics of

13

dysfunctional relationships. [¶] Is there a specific article that supports it? Probably not." When Dr. Malinek used the word "hypothesis," he was using it to mean "theory."

Following up, the trial court asked if Dr. Malinek was aware of any case studies that have made the correlation that he was seeking to make in support of his hypothesis. Dr. Malinek stated: "Well, the literature . . . on battered person's syndrome[—which] looks at people who are abused in a relationship, emotionally or physically[—]does lend quite a bit of support to the direction I am taking in trying to assess why people, men or women, stay in relationships that are not good for them." His hypothesis was based on his experience as an expert.

The trial court ruled: "I am finding that the doctor may not testify with respect to his hypothesis or theory. The court's reasoning is as follows: first of all, it appears to me that the only relevant issue is what was happening on August 2nd and August 3. Because the relationship, in fact, had terminated. And, in fact, [Dorsey] had indicated that he was walking away from the relationship.

"The question as to why he may have stayed in the relationship between the months of February and the end of July are either irrelevant or only very tangentially relevant here.

"It does appear to me that Dr. Malinek is not qualified to testify about the specific hypothesis that he intends to present to the jury. And I will note that by presenting it as a hypothesis, he adopted my characterization as this being a theory as opposed to an opinion that is based upon any scientific analysis or basis in science or even case studies and the like.

"I am also making a factual credibility determination that while I tried to ask Dr. Malinek about his specific background and experience that would qualify him to give this type of specific opinion, his response was general and in my view evasive, not because he was necessarily attempting to deceive the court, but because it became very clear to me that his opinion is drawing upon very general information about human behavior. And in doing so, it appears to me that to permit that type of testimony also runs the risk of interfering with the jury's function of making its own determination from the

facts as opposed to having those facts be dressed up in an expert opinion that would then supersede potentially the jurors' own independent evaluation.

"Having said that, I am going to allow [Dorsey] himself, if he would like on redirect, as we discussed, to explain anything that he would like concerning his mental state, including his mental state regarding why he stayed in the relationship for five months." The trial court also stated that defense counsel could elicit from Dorsey testimony regarding "whatever his mental state was on August 2nd and August 3."

When the trial continued, Dorsey testified that his grandmother, aunt and two sisters had mental illness, and he was one of the family members who helped take care of everyone.

In closing argument, the prosecutor posited that when Dorsey came down the stairs in the San Gabriel house, he had a choice of walking out to his car or finishing off the woman "that I have been attacking, the woman who is trying to destroy me, the woman that I don't like, the woman who left me." The prosecutor then stated: "And she's murdered not because she's bipolar. She's not murdered because she had methamphetamine in her system. She's murdered because he's angry. He's pissed off, and that's a motive."

B. *The Trial Court Did Not Commit State Law Error*.

　　　1. The Hypothesis was Irrelevant.

Evidence is relevant if it logically, naturally, and reasonably tends to prove or disprove a material issue in dispute. (*People v. Harris* (2005) 37 Cal.4th 310, 337.) When a trial court excludes evidence as irrelevant, that ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

Here, we find no abuse of discretion. The hypothesis had no tendency in reason to disprove the prosecution's theory of motive, which was that Dorsey killed Gina because he was angry.

15

In arguing that Dr. Malinek's hypothesis was relevant to the issues presented at trial, Dorsey states: "Immediately prior to the offenses, Gina and [he] were drinking wine, conversing, laughing and sharing hamburgers. [Citation.] This is the very phenomenon the expert was being called upon to explain. It was this behavior that the prosecution contended demonstrated a motive to kill the victim, and to which the defense sought to attach an alternative and more credible explanation. [Dorsey's] stated termination of the relationship between himself and [Gina] did not render the proposed testimony irrelevant, as the [trial court] asserted, but in fact was the very behavior that made such proposed testimony *relevant.*"

The problem is that Dorsey has not cited to any portion of the record suggesting that the prosecution argued that drinking wine, conversing with Gina, laughing and sharing hamburgers gave him a motive to kill. The point is waived. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 ["As a general rule, 'The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment'"].)

Next, Dorsey states: "Absent the proposed expert testimony, the jury, unfairly, was left with the prosecution's explanation: [Dorsey] engaged in the odd behavior of remaining or perpetuating a self-destructive relationship so he could kill the victim, [Gina], and be free of her threats; that is, her threats to tell law enforcement authorities that [Dorsey] had abused her."

To support his characterization of the prosecution theory, Dorsey refers us to a few paragraphs in the prosecutor's closing argument. The prosecutor stated: "Look, I'm not saying [Dorsey] went over there to kill her. But he knew that [she] was trying to destroy . . . him. That's what was going on in his mind. This woman is not returning my calls. She just said that she's going to report me and she's trying to destroy me. He knew Grace would be all the way in West [Los Angeles] [when] he [went] to Gina's house in San Gabriel[,] and she would be alone and maybe that would be his in. [¶] So when he was told multiple times to leave, please leave, after he had come and dropped off the check, which is his whole reason for going there obviously, does he leave? No. He

16

makes a choice to stay. He makes a choice to stay in that home of his estranged wife, and chooses to continue drinking. No one forced him to do this. . . . [¶] It is a man making a series of choices, going to confront and be with the person that has just left him, a person that he's been physically abusive towards. And the evidence is clear that he was physically abusive towards her in the past. A woman that he knows is afraid of [him], and is reporting him—and may be reporting him to the police, and is telling other people that he's been abusive towards her."

At no point in the text cited above did the prosecutor argue that Dorsey perpetuated a self-destructive relationship so he could kill Gina and be free of her threats.

2. Dr. Malinek's Qualification to Render the Hypothesis.

The trial court ruled that Dr. Malinek was not qualified to render the hypothesis. Dorsey does not clearly contend that this was error. Nonetheless, we have examined the issue. "'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' [Citation.] '"The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown."' [Citation.]" (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207.)

We conclude that the trial court did not abuse its discretion when determining that Dr. Malinek was not qualified. As noted by the trial court, Dr. Malinek's testimony was vague regarding his experience, and it appeared his hypothesis was based on general information about human behavior.

C. *The Trial Court Did Not Violate Dorsey's Constitutional Rights*.

A defendant in a criminal trial is entitled to due process and a fair trial, which includes an opportunity to present a complete defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) A defendant is denied the right to present a defense if the trial court excludes evidence that is vital to that defense. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) "The principle applies, however, only to 'relevant and material' evidence. [Citations.]" (*Ibid*.)

17

Because we have determined that Dr. Malinek's hypothesis was not relevant, the exclusion of Dr. Malinek's testimony regarding his hypothesis did not implicate any constitutional concerns.

## II. The Provocation Instruction.

Dorsey contends the trial court's instructions on adequate provocation necessary for a finding of voluntary manslaughter of Gina and attempted voluntary manslaughter of Grace impermissibly lightened the prosecution's burden of proof and therefore violated his right to a jury trial.

This contention lacks merit.

A. *Relevant Proceedings*.

In a colloquy regarding jury instructions, the prosecutor requested that the trial court modify CALCRIM Nos. 570 and 603 by adding the word "sober" to the definition of sufficient provocation so that the definition given to the jury would be this:  The provocation would have caused a sober person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.  (CALCRIM Nos. 570 & 603.)

Defense counsel objected, stating, "I believe that the CALCRIM instructions are very comprehensive, and I'm not—it says an ordinary person, your Honor.  And I think by its very meaning it means a person that is sober."  When asked, defense counsel clarified that he did not have a substantive objection.  Rather, he simply believed the modification was unnecessary.

The trial court asked if defense counsel planned to argue that Dorsey's intoxication should be considered with respect to the objective component of provocation.  Defense counsel replied, "Well, in my argument I will incorporate all the factual evidence, the emotional environment, the continuing stressors between [Gina] and [Dorsey], the lack of sleep, the fact that they had been drinking.  But that is just as a totality, in other words, as a background to it.  And I think that that's all the evidence.  [¶] But . . . the jury is going to have to interpret that as to how to apply it to this particular case as far as manslaughter is concerned."

18

Because of what defense counsel intended to argue, the trial court indicated that it perceived a danger that the jury might get "a little bit lost in what they can consider voluntary intoxication for and what they cannot consider it for." The trial court went on to state: "I don't see that there is any prejudice if there is no substantive disagreement. So I will give the adjective, but I will do no more than that." When defense counsel objected again, the trial court stated that "it is a matter of clarification, nothing more." Further, the trial court stated the adjective would be included "so that there is no confusion on the part of the jury as to the limitation as to the use they can make of voluntary intoxication," but that it would not give a stand-alone pinpoint instruction.

The jury was instructed about voluntary manslaughter and attempted voluntary manslaughter based on sudden quarrel or heat of passion. As to provocation, the trial court instructed as the prosecution requested.

B. *The Instructions Did Not Violate Dorsey's Right to a Jury Trial.*

If a trial court instructs a jury in a manner that lightens the prosecution's burden to prove every element of a crime beyond a reasonable doubt, the defendant is denied his right to a jury trial. (*People v. Hunter* (2011) 202 Cal.App.4th 261, 276 (*Hunter*).) We review constitutional issues de novo. (*Vargas v. City of Salinas* (2011) 200 Cal.App.4th 1331, 1341–1342.)

In our view, the trial court correctly instructed on the law.

A defendant who acts in a sudden quarrel or heat of passion because of sufficient provocation is presumed to act without the malice necessary for murder and is therefore guilty of only voluntary manslaughter. (*People v. Sedeno* (1974) 10 Cal.3d 703, 719, abrogated on other grounds by *People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*); §§ 187, subd. (a), 192, subd. (a).)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*); *People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The objective component is satisfied when the heat of passion is due to provocation that would "'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this

19

passion rather than from judgment"' [citation][.]'" (*People v. Trinh* (2014) 59 Cal.4th 216, 232–233.) The subjective component is satisfied when it is shown that the defendant "killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye*, *supra*, 47 Cal.4th at p. 550.)

Regarding the objective component, our Supreme Court has explained that the provocation "'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 585–586; *People v. Lee* (1999) 20 Cal.4th 47, 59–60 ["The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment"].)

Despite the foregoing authorities, Dorsey argues that the modification of the instructions "materially altered their meaning, to [his] substantial detriment." But the objective standard presumes a sober person of average disposition, so it cannot be said that the meaning was altered.

Drawing upon *Hunter*, Dorsey argues the following. The modification drew attention to the fact that he had been drinking and might not have been sober at the time of the offenses. "Accordingly, the instruction served notice to the jury that [Dorsey], not being a 'sober' person, was not being 'objectively reasonable' in being provoked and therefore was not entitled to the operation and benefit of the voluntary manslaughter instructions." As a result, "the jurors were permitted to interpret the offending instruction as a caution against finding a reasonable doubt on the basis of a finding of adequate provocation[.]"

In *Hunter*, a jury convicted the defendant of multiple robberies and found that during some of the robberies he had used a firearm. (*Hunter*, *supra*, 202 Cal.App.4th at p. 264.) The defendant assigned error to an instruction stating that "'[w]hen a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm." (*Id*. at pp. 275–276.) The *Hunter* court found that this instruction essentially pinpointed "a legal theory that favored the

20

prosecution by restricting the use of circumstantial evidence to raise a reasonable doubt." (*Id*. at p. 275.) There were two specific problems. The instruction was argumentative because the jury was told how circumstantial evidence could be used to find that the object was a firearm but not, conversely, how it could be used to find that the object was not a firearm. (*Id*. at p. 276.) This permitted the jurors to "interpret the instruction as a caution against finding a reasonable doubt on the basis that the victims were unable "to 'say conclusively that the gun was real and not a toy.'" (*Ibid*.) According to *Hunter*, this "impermissibly alleviated the district attorney's need to persuade the trier of fact that the gun used in the robbery was a real one, the most important fact at issue in the case." (*Ibid*.)

The insertion of the word "sober" into the provocation instruction was not argumentative because it did not suggest that sobriety was the test for whether a person acted in a reasonable manner. Rather, it properly explained to the jury that intoxication would not change what was reasonable for purposes of determining whether a person of average disposition would have been provoked. Properly understood, the instruction simply defined the objective standard in the provocation inquiry. Nor did the modification caution against a finding of provocation based on Dorsey being intoxicated because it did not suggest that an intoxicated person was incapable of acting in an objectively reasonable manner.

## III.  Instructions on Lesser Included Offenses.

Dorsey contends that the trial court violated its sua sponte duty to instruct on three particular lesser included offenses. With respect to murder and attempted murder counts, Dorsey asserts that the trial court should have given instructions on simple assault and assault by means of force likely to cause great bodily injury. With respect to the murder count, Dorsey asserts that the trial court should have given instructions on involuntary manslaughter based on a killing committed without malice in the course of a serious felony not inherently dangerous.

As discussed below, Dorsey's assertions fail.

21

A.  *The Applicable Law*.

Whether the trial court erred in failing to instruct on a lesser included offense is reviewed de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 739.)

"To determine whether a lesser offense is necessarily included in the charged offense, one of two tests (called the 'elements' test and the 'accusatory pleading' test) must be met.  The elements test is satisfied when '"all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense." [Citation.]'  [Citations.]  Stated differently, if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.  [Citations.]"  (*People v. Lopez* (1998) 19 Cal.4th 282, 288.)  "Under the accusatory pleading test, a lesser offense is included within the greater charged offense '"if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." [Citation.]'  [Citations.]"  (*Id*. at pp. 288–289.)

B.  *Simple Assault and Assault With a Deadly Weapon Are Not Lesser Included Offenses of Murder and Attempted Murder*.

In urging error, Dorsey relies on the elements test.  But under that test, neither simple assault nor assault with a deadly weapon are a lesser included offenses of either murder or attempted murder because murder or attempted murder can be committed without an assault.  (*People v. Sanchez* (2001) 24 Cal.4th 983, 988 [since murder can be committed without a deadly weapon, assault with a deadly weapon is not necessarily included within murder]; *People v. Richmond* (1991) 2 Cal.App.4th 610, 616 ["assault with a deadly weapon is not a lesser included offense of attempted murder with the use of a deadly weapon, because attempted murder can be committed without using a deadly weapon"]; *People v. Benjamin* (1975) 52 Cal.App.3d 63, 71 ["one could commit murder by withholding food and drink from an invalid"].)

Dorsey argues that "while the act of 'withholding food and drink . . . ' is by itself a nonviolent act, the foreseeable consequences of that act is necessarily the application of force which unless interrupted by some circumstance not intended by the original design,

22

will result in death.  For example, it has been noted that a person in the process of dying from dehydration would suffer many symptoms that could be characterized as 'force' or 'violence' directly attributable to the withholding of fluids, including but not limited to vomiting and dry heaves, convulsions, swelling of the tongue, plugging of the lungs with secretions and the failure of major organs."

We are not persuaded.  In support of his argument, Dorsey relies on a partial dissent in *Brophy v. New England Sinai Hospital, Inc.* (1986) 497 N.E.2d 626, a Massachusetts case.  In *Brophy*, a family was faced with a family member who was in a vegetative state.  They wanted to cut off nutrition and hydration, but the hospital and attending physician opposed, so the matter ended up going to court for resolution.  The majority sided with the family, and the dissenting judges sided with the state.  In a footnote, one of the dissenting judges stated:  "The judge found that death by dehydration is extremely painful and uncomfortable for a human being.  The judge could not rule out the possibility that Paul Brophy could experience pain in such a scenario.  Paul Brophy's attending physician described death by dehydration as cruel and violent." (*Id*. at p. 341, fn. 2, Lynch, J., dissenting in part.)

The footnote merely describes the effects of dehydration and starvation on the human body.  It does not analyze whether assault is a lesser included offense of murder, and therefore offers us no guidance.

C.  *With Respect to the Murder Count, the Trial Court Was Not Required to Instruct on Involuntary Manslaughter Based on a Killing Committed Without Malice in the Course of a Noninherently Dangerous Felony*.

"[A] killing without malice in the commission of a noninherently dangerous felony [constitutes] involuntary manslaughter if 'committed without due caution and circumspection.'  [Citation.]"  (*People v. Bryant* (2013) 56 Cal.4th 959, 966.)  According to Dorsey, the jury should have been instructed on this principle of law.  He argues that "one or more of the jurors could reasonably have found the killing to have been done without malice, so as to render the offense involuntary manslaughter[.]"  This argument is unavailing.  The duty to instruct on a lesser included offense is not triggered unless

23

substantial evidence suggests that the defendant is guilty of only the lesser offense. (*Breverman*, *supra*, 19 Cal.4th at p. 162.) Dorsey does not contend—nor could he—that his act of stabbing Gina 13 times was a noninherently dangerous felony. As a result, there is no need for further analysis.

## IV. Rebuttal Evidence.

Dorsey contends that he was denied due process because the erroneous admission of the testimony of Ho and De La Torre during rebuttal denied him a fundamentally fair trial. He relies on due process, Evidence Code section 1101, subdivision (a) and Evidence Code section 352 objections that are being raised for the first time on appeal. This contention is forfeited, and it lacks merit.

A. *Relevant Proceedings*.

The prosecutor submitted a trial brief which indicated, inter alia, that when Dorsey was interviewed, he painted Gina as the aggressor. Anticipating that Dorsey would offer evidence of self-defense or imperfect self-defense, the prosecution stated that it would seek to introduce the following evidence: De La Torre saw Gina the day before the murder, and she had the remnants of a black eye. She said that her husband beat her over the weekend. Ho, the husband Gina separated from in 2004, spoke to Gina on three occasions during which she described various instances of domestic violence involving Dorsey.

According to the prosecutor, the evidence was admissible to prove Gina's state of mind, i.e., that she was afraid of Dorsey. If she was afraid of him, the prosecutor maintained that evidence of her state of mind would rebut any claim by Dorsey that he acted in self-defense or imperfect self-defense.

In a pretrial hearing, the trial court deferred its ruling.

When the matter was argued next, the prosecutor stated that it was offering the testimony of De La Torre and Ho to show Dorsey knew Gina was telling others he was abusive, which gave him a motive to kill her. The prosecutor outlined the anticipated testimony of each witness. Also, he noted that the trial court had indicated a concern that Dorsey was not aware of Gina's statements. The prosecutor stated, "I think through my

cross-examination I have established that [Dorsey] did, in fact, know that Gina was telling people that he was abusive toward her. So he did have a subjective awareness that she was at least projecting or telling people that he was an abusive husband."

Defense counsel complained that the De La Torre's testimony was hearsay, particularly as to whether Gina had a black eye. The trial court stated, "What is your response, though, to the [prosecutor] . . . relying upon Evidence Code section 1250 to admit this as being relevant, in effect, as evidence of motive of your client[?] Your client knew that [Gina] was telling people that, in fact, he had beaten her, and he therefore was concerned about her spreading these, from his perspective, lies that perhaps caused him in part to have motive to kill her. That's what I understand to be the argument that is being raised, and why it can be overcome by [a hearsay] exception[.]" To this, defense counsel stated he had no objection to allowing De La Torre to testify that Gina said "she was involved in domestic violence with [Dorsey] on a broad basis," but he did object to De La Torre testifying "as to specifics because that comes in for the truth of the matter. And the truth of the matter is that he never actually saw that black eye. He is only relying on her telling him this."

In response, the trial court asked why it would not be sufficient to give a limiting instruction that the "evidence is not to be taken for the truth of the matter but [may be used] only to the extent that it is relevant as to whether [Dorsey] had a motive to kill[.]" The defense submitted.

Subsequently, the trial court stated it had revised the limited purpose instruction, and it would "instruct [the jury] not only at the close, but also contemporaneously with the witnesses who will testify when they testify about [Gina's] statements."

In the rebuttal case, De La Torre testified that Gina telephoned him on August 2, 2011 and said she had not been to work for two or three days because her husband had beaten her and given her a black eye. Ho testified that Gina told him that she was scared of Dorsey and, on July 30, 2011, said Dorsey had beaten her. Ho testified that he saw bruises on Gina's wrist, arms, right hamstring, and facial area on August 1, 2011. Gina told him she got the injuries from Dorsey.

25

Following the testimony of Ho and De La Torre, the trial court addressed the jury and stated: "[Y]ou did hear from both Jerry Ho who just testified, and also [De La Torre], and they explained to you conversations they had with [Gina] and that [Gina] told both of them that [Dorsey] hit her or hurt her in some way. [¶] You may not consider those statements for their truth, but rather you may consider them only to the extent that you find them to be relevant to motive."

Before the jury deliberated, the trial court instructed: "During the trial certain evidence was admitted for a limited purpose, and the example that I gave you or will give you is what happened this morning. [¶] You heard evidence that [Gina] told [De La Torre] and [Ho] that the [Dorsey] had hit or hurt her. You may not consider those statements for the truth, rather, you may consider them only to the extent that you find them relevant to motive."

B. *Forfeiture.*

In general, a defendant cannot advance an appellate objection to evidence unless he made that specific objection below. (*People v. Cowan* (2010) 50 Cal.4th 401, 465; *People v. Price* (1991) 1 Cal.4th 324, 430.) While counsel for Dorsey objected to De La Torre's testimony based on hearsay, counsel did not lodge any other objections regarding the testimony of the rebuttal witnesses. Thus, Dorsey has waived the due process, Evidence Code section 1101, subdivision (a), and Evidence Code section 352 objections he now raises on appeal.

C. *No Denial of Due Process.*

To be complete, we have analyzed Dorsey's due process claim.

The erroneous admission of evidence results in a violation of a criminal defendant's right to due process if it makes a trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial."

26

[Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230.)

Dorsey contends that the rebuttal evidence was inadmissible propensity evidence that invited the jury to speculate that he had a disposition for violence and probably committed the charged offenses. He posits that the introduction of this evidence necessarily rendered the trial fundamentally unfair because inadmissible propensity evidence is highly prejudicial. The undoing of this contention is that Ho's and De La Torre's testimony was admitted as motive evidence under Evidence Code section 1101, subdivision (b), not as propensity evidence subject to exclusion under Evidence Code section 1101, subdivision (a).

Next, Dorsey argues that the testimony should have been excluded as more prejudicial than probative. (Evid. Code, § 352.) Even if that is true, the testimony was not of such a quality that it denied Dorsey a fair trial. It was only offered as motive evidence. Moreover, it pertained to conduct that was tame compared to Dorsey's attacks on Grace and Gina, so the testimony was not likely to be given undue weight by the jury, particularly after the jury was instructed not to consider the testimony for the truth of the matter asserted in Gina's statements. Finally, we note that Grace testified that maybe three times Gina said Dorsey had beaten her, and Gina had claimed Dorsey threw her across a room one time. Consequently, the rebuttal evidence was not the only evidence of past domestic violence.

At most, any error was state law error. Based on the brutal nature of Gina's murder by stabbing, there was overwhelming evidence of malice. We therefore conclude that the error, if any, was harmless because it is not reasonably likely that the jury would have returned a more favorable verdict without the evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In other words, is not probable the absence of the rebuttal evidence

27

would have resulted in the jury finding a lack of malice and convicting Dorsey of manslaughter instead of murder.

## V.  No Ineffective Assistance of Counsel.

Dorsey contends he was denied effective assistance of counsel because (1) trial counsel failed to present expert testimony regarding the fight or flight syndrome, and (2) trial counsel failed to raise sufficient objections to the testimony of Ho and De La Torre offered by the prosecution in rebuttal.

These contentions lack merit.

A.  *Applicable Law*.

The Sixth Amendment establishes that a defendant in a criminal trial has a right to counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 685.)  The United States Supreme Court has recognized that the right to counsel is the right to effective assistance of counsel.  (*Ibid*.)  To establish the denial of effective assistance, a "'defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms.  Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him.'  [Citation.]"  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052–1053.)  Generally, "a claim of ineffective assistance of counsel will not be reviewed on appeal absent a record from which it may be ascertained that there is no reasonable tactical explanation for an attorney's alleged failure to perform in a manner to be expected of a reasonably competent attorney."  (*People v. Milner* (1988) 45 Cal.3d 227, 241.)

B.  *The Failure to Call an Expert Regarding the Fight or Flight Syndrome Was Neither Ineffective Assistance Nor Prejudicial*.

In Dorsey's view, defense counsel should have presented expert testimony on fight or flight syndrome, a phenomenon whereby a person under stress may act impulsively or without conscious thought.  This evidence, he argues, would have proved that he did not harbor the malice necessary for murder.

28

We are told that fight or flight syndrome is a neurologic condition characterized by autonomic responses whereby a subject reacts spontaneously when confronted with a life-threatening situation or a situation evoking extreme rage, and that this may be exacerbated by a person's intoxication.

To establish the syndrome, Dorsey cites *Hill v. Virga* (N.D. Cal. 2013) 2013 U.S. Dist. Lexis 11305, at pp. *13–15 (*Hill*) and *Dumontier v. Schlumberger Tech. Corp.* (9th Cir. 2008) 543 F.3d 569, 570–571 (*Dumontier*).

The defendant in *Hill* was a gang member who shot at two police officers with an assault rifle. He filed a petition for habeas corpus raising various constitutional issues after being convicted of second degree murder with a peace officer special circumstance and firearm enhancements; attempted first degree murder; assault on a peace officer with personal use of an assault weapon; and possession of an assault weapon with a gang allegation. (*Hill, supra,* 2013 U.S. Dist. Lexis 11305, at pp. *1–3, 19.)

At trial, the defendant in *Hill* argued that he was at a street corner to buy marijuana and thought the two police officers were rival gang members who were going to shoot him, which prompted him to act in self-defense. (*Hill*, *supra*, 2013 U.S. Dist. Lexis 11305, at pp. *15–16.) The surviving police officer's statements regarding whether his police star was over or under his shirt—and therefore whether it was apparent he was a police officer—were inconsistent. Right after the shooting, he said his police star was under his shirt. Two years later, he said it was over his shirt. A neurophysiologist testified on the effects of high stress on human functioning, particularly perception and memory. He then opined "that a hypothetical police officer's statement, taken 48 hours after an extremely traumatic event, that his police star was underneath his shirt (or he could not remember the star's location) was more reliable than the same officer's trial testimony two-and-a-half years later that this star was outside his shirt. [The neurophysiologist] also opined that waiting 48 hours to interview a police officer whose partner died in a shooting results in the officer's memory being less accurate than it would have been had he been interviewed much closer to the time of the shooting." (*Hill, supra,* 2013 U.S. Dist. Lexis 11305, at pp. *13–14.)

29

Next, the neurophysiologist "testified that a person under the influence of marijuana will have 'less acuity in terms of processing information, . . . discerning intentions, assessing consequences  . . . .'  He said that under the influence of marijuana a person tends to get distracted, has a short attention span, does not process information as carefully, and takes longer to make decisions.  He opined that hypothetically, when a person is under the influence of marijuana and is in a high stress situation where they feel their life is threatened, the person is more prone to 'automatic fight or flight responses.  If [the person has] the resources to fight, the research indicates the person would probably engage in counterattack.  If [the person] would have the . . . capability for flight but not the resources to attack, [the person will] try to run . . . try to escape.'  [The neurophysiologist] said this would include police officers and gang members."  (*Id*. at pp. 15-16.)

In *Dumontier*, the court interpreted the meaning of bodily injury in connection with the Price-Peterson Act (42 U.S.C. § 2014), federal legislation that provides a remedy for bodily injury arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material.  (*Dumontier*, *supra*, 543 F.3d at p. 569.)  At issue was whether subcellular damage qualified as bodily injury.  (*Id*. at p. 570.)  The court stated:  "Plaintiffs argue that the slightest exposure to radiation damages cells by denaturing proteins and modifying DNA. This, they argue, qualifies as bodily injury under the Act.  But not every alteration of the body is an injury. Thinking causes synapses to fire and the brain to experience tiny electric shocks; fear stimulates the production of chemicals associated with the fight-or-flight response.  All life is change, but all change is not injurious.  Adopting plaintiffs' interpretation of bodily injury would render the term surplusage, as every exposure to radiation would perforce cause injury.  [Citation.]"  (*Ibid*., fn. omitted.)

Finally, to establish the fight or flight syndrome as a viable defense, Dorsey cites *Deutscher v. Whitley* (9th Cir. 1989) 884 F.2d 1152, 1161 (*Deutscher*).  In that case, a defendant filed a petition for writ of habeas corpus after being sentenced to death for murder and robbery.  The court found that counsel provided ineffective assistance at the

penalty phase of the trial by failing to investigate the defendant's possible mental impairment and present any evidence in mitigation. (*Id*. at p. 1159.) Per the court, it might have made a difference if counsel had called a psychiatrist who had previously examined the client. The psychiatrist would have testified that "premature children such as [the defendant] can develop a mental disorder characterized by episodes of uncontrollable violence that are often accompanied by a temporary loss of memory. He would have testified that stress and alcohol can make such an outburst more likely and that [the defendant's] story that he had blacked out was consistent with the symptoms of this disorder. Mental health records would have shown diagnoses of schizophrenia, pathological intoxication, and organic brain damage; commitments to mental institutions; and a history of good behavior in institutional settings. The records would have also shown that [the defendant] had asked for but had not received treatment for episodes of uncontrollable violence." (*Id*. at pp. 1160–1161.)

We find no basis to conclude that case law dictated that Dorsey's counsel should have called an expert regarding fight or flight syndrome. *Hill* did not establish—nor did it discuss—whether the fight or flight syndrome negates malice and reduces a homicide from murder to manslaughter. Neither did *Dumontier* or *Deutscher*. Regardless, if fight or flight syndrome were a viable defense to murder, the appellate record would be insufficient to determine there was no reasonable tactical explanation for the decisions made by Dorsey's counsel. And if ineffective assistance of counsel had been established, it would not be grounds for reversal. Grace's testimony plus the evidence that Dorsey stabbed Gina 13 times was overwhelming evidence of malice, and it is not reasonably probable that Dorsey would have been acquitted if his counsel had presented the expert testimony being urged on appeal.

C. *The Failure to Assert More Objections to the Rebuttal Evidence Was Not Prejudicial.*

Assuming without deciding that Dorsey's counsel should have asserted due process and Evidence Code section 352 objections to the testimony of Ho and De La Torre, there was no prejudice. As discussed in connection with Dorsey's assertion of evidentiary error related to that testimony, it is not reasonably probable that its absence would have resulted in Dorsey obtaining a better outcome, i.e., a conviction for manslaughter instead of murder.

## VI. Cumulative Error.

Dorsey contends that the multiple errors infected his trial and were cumulatively prejudicial, even if no one error was prejudicial standing alone. We have explained why there was either no error, or why any errors were harmless. Thus, we decline to find that there were errors that are cumulatively prejudicial. If there were errors, they do not "create[] a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill* (1998) 17 Cal.4th 800, 847.)

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
BOREN

_____, J.
HOFFSTADT

32